UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                         :

VICTORIA FAYE MILLER         :         CASE NO. 3:19 CV 49 (RMS)
                         :

v.                             :

                         :

ANDREW M. SAUL,          :
COMMISSIONER OF         :
SOCIAL SECURITY[1]       :         DATE: MARCH 11, 2020
                         :
------------------------------------------------------ x

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"] denying the plaintiff Social Security Disability Insurance ["SSDI"] and Supplemental Security Income ["SSI"] benefits.

## I. ADMINISTRATIVE PROCEEDINGS

On or about February 16, 2016, the plaintiff filed an application for SSDI benefits claiming that she had been disabled since January 15, 2015,[2] due to seizures, high blood pressure, and back pain. (Certified Transcript of Administrative Proceedings, dated January 31, 2019 ["Tr."] 216–17; *see* Tr. 52, 81). On or about March 24, 2016, the plaintiff filed an application for SSI benefits. (Tr. 218–37). The Commissioner denied the plaintiff's applications initially and upon

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. P. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

[2] On October 10, 2017, the plaintiff amended her alleged onset date to February 2, 2016. (Tr. 340; *see* Tr. 10).

reconsideration. (Tr. 52–60, 61–69, 72–79, 80–87, 90–100, 101–11, 120–22, 124–26, 133–41, 142–50). On August 24, 2016, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 151–52; *see* Tr. 155–69), and on November 6, 2017, a hearing was held before ALJ Ronald J. Thomas, at which the plaintiff and a vocational expert, Edmond J. Calandra, testified. (Tr. 27–51; *see* Tr. 172–200, 201–06, 344–45). On February 13, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 7–26). On March 22, 2018 and April 11, 2018, the plaintiff requested review of the hearing decision (Tr. 213–15; Tr. 211–12), and on November 16, 2018, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

On January 10, 2019, the plaintiff filed her complaint in this pending action. (Doc. No. 1). On January 29, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was assigned to this Magistrate Judge. (Doc. No. 10). The defendant filed the Certified Administrative Transcript on March 11, 2019. (Doc. No. 11). On May 14, 2019, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 13), brief in support (Doc. No. 13-1 ["Pl.'s Mem."]), and Statement of Material Facts (Doc. No. 13-2). The defendant filed his Motion to Affirm the decision of the Commissioner on July 11, 2019 (Doc. No. 14), with brief in support (Doc. No. 14-1 ["Def.'s Mem."]), and Statement of Material Facts (Doc. No. 14-2).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is DENIED, and the defendant's Motion to Affirm (Doc. No. 14) is GRANTED.

## II.   FACTUAL BACKGROUND

At the time of her amended alleged onset date of disability, February 2, 2016, the plaintiff was forty-five years old, was not married, and had three children and four grandchildren.  (Tr. 15; Tr. 30–31).  She lived in an apartment with her son and three of her grandchildren.  (Tr. 30–31; Tr. 267).  The plaintiff completed high school and worked until 2016.  (Tr. 31–32).  At the time of the hearing, the plaintiff was forty-seven years old.  (*See* Tr. 30).  The plaintiff's date last insured is March 31, 2020.  (Tr. 13).

### A.   MEDICAL HISTORY[3]

#### 1.   CENTRAL FLORIDA TRUE HEALTH[4]

The plaintiff's treatment history with Central Florida True Health ["True Health"] began in 2014.  In March 2014, Angela Ford, who was an Advanced Registered Nurse Practitioner ["ARNP,"] examined the plaintiff, during which the plaintiff noted her history of seizures but denied any seizures during the review of systems.  (Tr. 572).  ARNP Ford's physical examination of the plaintiff was unremarkable, and the plaintiff noted that she was not currently experiencing pain, nor did she experience chronic pain.  (Tr. 571, 572–73).  ARNP Ford informed the plaintiff that her latest mammogram was abnormal and advised her to follow-up.  (Tr. 573–74).  She assessed the plaintiff to have grand mal seizures, an abnormal mammogram, essential hypertension, obesity, and vitamin D deficiency.  (Tr. 573).

Dr. Peter Oostwouder examined the plaintiff on May 29, 2014 and noted that the plaintiff was not experiencing any pain currently, nor did she experience chronic pain.  (Tr. 563).  While

---

[3] This recitation is taken primarily from the parties' respective Statements of Material Facts (Doc. Nos. 13-2 and 14-2).  Commonly used medical terms do not appear in quotation marks although the terms are taken directly from the plaintiff's medical records.

[4] The Central Florida True Health Records appear in the record at both exhibit 1F and exhibit 4F.  (*See* Tr. 351–92; Tr. 535–80).  The Court includes citations to only exhibit 4F.

discussing the "history of present illness," Dr. Oostwouder noted that the plaintiff had suffered seizures since age eighteen, but that "she has not had a seizure in 8 years" and that the plaintiff controlled her seizures with medications. (Tr. 564). Dr. Oostwouder noted also that the plaintiff had a history of brain malformation, which caused her to lose consciousness, fall, and jerk. (Tr. 564). A physical examination of the plaintiff was normal (Tr. 564), and Dr. Oostwouder noted that the plaintiff's seizure condition had "improved." (Tr. 565).

Dr. Oostwouder examined the plaintiff again in January 2016, at which time he noted that the plaintiff was not experiencing any pain and that her seizure condition had improved. (Tr. 544). On March 2, 2016, the plaintiff reported that she was experiencing back pain, and that the pain was a nine out of ten. (Tr. 540). Dr. Oostwouder noted on the March 2, 2016 record, however, that the plaintiff "left [without] being seen." (Tr. 539).

2. OPTIMUS HEALTH CARE

The plaintiff's treatment history with Optimus Health Care ["Optimus"] dated back to at least 2011. The plaintiff's early records with Optimus reflected normal examinations. (*See* Tr. 658–88). On February 23, 2015, Advanced Practice Registered Nurse ["APRN"] Marlene Pressoir examined the plaintiff during her annual medical physical. (Tr. 651). APRN Pressoir noted that the plaintiff was recently hospitalized due to a seizure. (Tr. 651). APRN Pressoir noted also that, at the time the plaintiff suffered the seizure, she had not taken her seizure medication because she did not have insurance coverage and could not afford the medicine. (Tr. 651). Following this examination, APRN Pressoir assessed that the plaintiff experienced convulsive disorder but otherwise had a "[n]ormal routine history and physical." (Tr. 655).

On August 19, 2016, the plaintiff presented to Optimus for a routine follow-up appointment and complained of lower back pain and acid reflux. (Tr. 640). APRN Michelle Smith examined

the plaintiff and noted that her lower back "exhibited tenderness on palpation." (Tr. 641). APRN Smith prescribed Ibuprofen 400mg for the plaintiff's back pain and advised her to wear supportive shoes and take warm soaks in the tub.[5] (Tr. 642). A treatment note from December 28, 2016 by APRN Marlene St. Juste indicated that the plaintiff had been "[s]een by [a] [p]sychiatrist" and diagnosed "with [a]nxiety and [d]epression/PTSD" and given a prescription "for sleep disturbance related to PTSD." (Tr. 632). On April 4, 2017, the plaintiff presented to Optimus and complained of a headache that had been "on and off" for two months. (Tr. 627). A physical examination of the plaintiff revealed "tenderness on palpation center of back." (Tr. 629). APRN St. Juste referred the plaintiff for an MRI of her lower back. (Tr. 630). In June 2017, APRN St. Juste noted that the plaintiff continued to complain of lower back pain but had not yet obtained the MRI. (Tr. 916).

On October 15, 2017, APRN St. Juste completed a medical source statement. (Tr. 999–1001). She noted that the plaintiff's diagnoses were backache, seizures, depression, PTSD, and hypertension. (Tr. 999). APRN St. Juste opined that the plaintiff could walk one city block without rest, and that she could sit and stand continuously for thirty minutes at one time. (Tr. 999). She opined also that the plaintiff could sit and "stand/walk" each for about four hours "total in an [eight]-hour working day (with normal breaks)." (Tr. 999). APRN St. Juste indicated that the plaintiff needed a job that permitted shifting positions at will from sitting, standing, or walking, and that she would likely need to take unscheduled breaks every thirty minutes that lasted for approximately fifteen minutes. (Tr. 999–1000). She opined that the plaintiff could occasionally lift up to twenty pounds but that she could never lift fifty pounds, and that the plaintiff had no limitations doing repetitive reaching, handling, or fingering. (Tr. 1000). APRN St. Juste opined also that the plaintiff could never bend during the workday and could twist at the waist for twenty-

---

[5] The treatment record from this date reflects also that the plaintiff failed to show for an appointment with a neurologist following a previous referral from APRN Smith. (Tr. 640, 642).

five percent of an eight-hour workday. (Tr. 1000). As for postural limitations, APRN St. Juste included that the plaintiff could occasionally twist, crouch, and climb stairs, but never stoop or climb ladders. (Tr. 1001). She noted also that the plaintiff should avoid exposure to the following: extreme cold, extreme heat, high humidity, fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. (Tr. 1001). APRN St. Juste concluded that the plaintiff's impairments would likely produce good days and bad days and would cause her to be absent from work more than twice per month. (Tr. 1001).

### 3.   LIFEBRIDGE COMMUNITY SERVICES

The plaintiff sought mental health treatment at LifeBridge Community Services ["LifeBridge"]. The plaintiff presented to LifeBridge on August 25, 2016, with "symptoms of depression (crying, inability to sleep, poor hygiene, lack of concentration, guilt, anger/irritability, loss of appetite)." (Tr. 589). The plaintiff reported that she had been very depressed and had not gotten out of bed for four days. (Tr. 589). She indicated that she was seeking treatment in order to address "[v]ocational/career issues" and "[p]sychological difficulties." (Tr. 589). Upon examination, the plaintiff was assessed with "none" of the following symptoms: elation or euphoria, talkative or pressured speech, change in libido, excessive spending, grandiosity, increased level of activity, depersonalization, phobia, obsessions, compulsions, flashbacks, nightmares, self-injury, hallucinations, and delusions. (Tr. 590–91). She was assessed with "mild" symptoms of the following: worthlessness, anxious mood, lack of concentration, trauma and intrusive thoughts. (Tr. 590–91). She was assessed with "moderate" symptoms of the following: depressed mood, crying, sleep disturbance, appetite or weight change, abnormal eating patterns, loss of initiative, anger or irritability, guilt, agitation or restlessness, and social avoidance. (Tr. 589–90). The plaintiff was assessed with "severe" symptoms of the following: fatigue or low

energy, and rapid flow of thoughts. (Tr. 589). It was also noted that the plaintiff was "very forgetful" as she could not remember if she had done certain things or not. (Tr. 591). The record from August 25, 2016 reflects also that the plaintiff was in "poor" health, but appeared well-groomed, cooperative, and calm. (Tr. 593). She had a depressed mood, "soft" speech, "thought blocking" thought process, "concrete" thought content, impaired memory, fair judgment, impaired insight, impaired concentration, fair abstract reasoning, average intelligence, and no suicidal ideation or violence. (Tr. 593–95).

On May 3, 2017, the plaintiff presented to LifeBridge, where it was noted that she appeared alert and calm. (Tr. 840). An assessment of the plaintiff's motor function, gait and station were normal, as was the plaintiff's speech and language abilities. (Tr. 840). The plaintiff's thought process was spontaneous, her associations were normal, and she had no abnormal or psychotic thoughts. (Tr. 841).

The plaintiff began seeing clinician Hope Taylor for treatment in June 2017. (*See* Tr. 854). During a session on July 6, 2017, Ms. Taylor noted that the plaintiff reported with "dysregulation of mood and emotions related to challenges with finances and family conflicts." (Tr. 854). The plaintiff worked with Ms. Taylor to create a plan to prioritize self-care. (Tr. 854). Similarly, on July 13, 2017, Ms. Taylor noted that the plaintiff reported "dysregulation of mood and emotional reactivity." (Tr. 854). The plaintiff reported multiple "conflicts" to Ms. Taylor during July and August 2017 that caused the plaintiff to "return[] to old pattern of spending significant time in bed." (Tr. 852).

On October 19, 2017, Ms. Taylor completed a medical source statement. (Tr. 994–96). She noted that the plaintiff's diagnoses were PTSD and depressive disorder due to other medical problems, and that the plaintiff's prognosis was "fair." (Tr. 994). Ms. Taylor indicated that the

plaintiff had "[p]oor or [n]one"[6] ability to function in the following areas: interacting appropriately with the general public, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, maintaining attention for two hour segments, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with stress of semiskilled and skilled work. (Tr. 994–96). Ms. Taylor opined that the plaintiff had a "fair"[7] ability to do the following activities: maintain socially appropriate behavior; adhere to basic standards of neatness; travel in an unfamiliar place; remember work-like procedures, maintain regular attendance and be punctual within customary, usually strict tolerances; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions. (Tr. 994–95). Ms. Taylor opined that the plaintiff had "good"[8] abilities only in the category of using public transportation. Ms. Taylor concluded that the plaintiff's impairments would cause her to be absent from work more than twice per month. (Tr. 996).

---

[6] "Poor or None" is defied as "[n]o useful ability to function in this area." (Tr. 994).
[7] "Fair" is defined as "[a]bility to function in this area is [] seriously limited but not precluded." (Tr. 994).
[8] "Good" is defined as "[a]bility to function in this area is limited but is satisfactory." (Tr. 994).

### 4. BRIDGEPORT HOSPITAL PRIMARY CARE CLINIC

On December 21, 2016, Dr. Mariapia Morelli examined the plaintiff at the Bridgeport Hospital Primary Care Clinic ["Bridgeport Hospital"]. The plaintiff explained to Dr. Morelli that she had her first seizure at sixteen years old, and that anything could trigger a seizure. (Tr. 803). A physical examination of the plaintiff revealed "[n]o cranial nerve deficit," and, throughout the musculoskeletal system, the plaintiff showed "[n]ormal range of motion" and "no edema, tenderness, or deformity." (Tr. 805). The plaintiff obtained an MRI in January 2017, which revealed: "No acute intracranial abnormality. Parenchymal atrophy, volume loss and adjacent periventricular gliosis involving the bilateral parieto-occipital regions, greater on the left. The etiology is uncertain however most likely related to a remote ischemic insult." (Tr. 806, 808, 822). On May 10, 2017, a physical examination of the plaintiff revealed "mild tenderness in the lumbar region." (Tr. 809). The plaintiff had a normal gait "with good posture and balance." (Tr. 810). A May 31, 2017 examination revealed "normal range of motion" and "no edema, tenderness or deformity." (Tr. 812).

### 5. CONSULTATIVE EXAMINATION

On July 5, 2016, Dr. Sam Ranganathan completed a consultative examination of the plaintiff. (Tr. 581–87). Under "history of present illness," Dr. Ranganathan noted, *inter alia*, the plaintiff's history of seizure disorder since 1995 and added that the plaintiff "says that the seizure is not grand mal seizure." (Tr. 582). He noted also that the plaintiff had a history of high blood pressure, as well as "low back pain all the time since 2013." (Tr. 582). Dr. Ranganathan stated that the pain in the plaintiff's lower back got worse when she walked but did not radiate to the legs. (Tr. 582). He stated also that the plaintiff "was treated with medication, and recommended therapy; that she never had." (Tr. 582). Under the section "impact on day-to-day activities," Dr.

Ranganathan noted, *inter alia*, that the plaintiff did not cook but sometimes helped her daughter do the dishes. (Tr. 582). He noted also that the plaintiff was able go grocery shopping with her son, shower, dress, and do laundry, but that she did not clean the house, handle the garbage, or attend church. (Tr. 582).

Dr. Ranganathan noted under "review of systems" that "[t]he claimant has headache sometimes followed by seizure[,] takes Tylenol which helps and the rest is negative . . . except as mentioned above." (Tr. 583). An examination of the plaintiff's central nervous, motor, and sensory systems was unremarkable; and an examination of the plaintiff's gait revealed that she was "able to walk without assistive devices, able to do tandem walking. The claimant was finding it hard to walk on the heels and toes more than on to two steps." (Tr. 583). An examination of the plaintiff's musculoskeletal system[9] revealed "tenderness in the paralumbar spine" and positive straight leg raising "in right at 50 degrees, and left at 70 degrees in supine position." Dr. Ranganathan added that the plaintiff was "able to get on and off the examination table, able to sit on the examination table [and] in the waiting room[,]" and walk down the hallway. (Tr. 583). An examination of the plaintiff's extremities was unremarkable. (Tr. 583). Dr. Ranganathan also viewed x-rays of the plaintiff's lumbar spine, which showed "[m]ild multilevel degenerative joint disease." (Tr. 583). Under "final impression," Dr. Ranganathan noted the following conditions: seizure disorder, hypertension, and degenerative joint disease of the lumbar spine. (Tr. 583).

6.     STATE AGENCY CONSULTANT OPINIONS

On April 25, 2016, State agency consultant Stephanie Boyd, SDM, completed an evaluation of the plaintiff. (*See* Tr. 52–60; Tr 61–69). Dr. Boyd concluded that the plaintiff

---

[9] A "Range of Motion Report Form" showed that the plaintiff's active range of motion was within normal limits for all motions tested. (*See* Tr. 585–86).

suffered from the severe impairments of major motor seizures and essential hypertension.[10] (Tr. 55, 64). She concluded also that the plaintiff's medically determinable impairments would be expected to produce the plaintiff's pain and other symptoms, and that the plaintiff's "statements about the intensity, persistence, and functionally limiting effects of the symptoms" are "substantiated by the objective medical evidence alone."[11] (Tr. 55–56, 64–65). Dr. Boyd opined that the plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.[12] (Tr. 56, 65). Dr. Boyd opined further that the plaintiff had an unlimited ability to climb ramps and stairs, stoop, kneel, crouch, and crawl; that she could frequently climb ladders, ropes, or scaffolds; and that she could never balance. (Tr. 57, 65–66). Dr. Boyd determined that the plaintiff could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and "fumes, odors, dusts, gases, poor ventilation, etc.[,]" but that she should "[a]void concentrated exposure" to hazards such as machinery or heights. (Tr. 57, 66). Dr. Boyd explained that these limitations were based on the plaintiff's "history of grand mal seizures and back pain" (Tr. 56, 57, 65, 66), and that she demonstrated the maximum sustained work capacity for light exertion work. (Tr. 59, 68).[13] Dr. Boyd added that, "given the [plaintiff's] age, education, and RFC[,]" the "applicable Medical-Vocational Guidelines would direct a finding of 'not disabled.'" (Tr. 57–58, 67–68). She concluded that the plaintiff was not disabled.[14] (Tr. 60, 69).

---

[10] On July 29, 2016, State agency consultant Rhonda Campbell completed reconsideration level assessment of the plaintiff. (*See* Tr. 72–79; Tr. 80–87). She concluded that, in addition to the severe impairments that Dr. Boyd noted, the plaintiff also suffered from the severe impairment of "[s]pine [d]isorders." (Tr. 76, 84).

[11] In the July 29, 2016 reconsideration assessment, Ms. Campbell reached the same conclusions. (*See* Tr. 77, 85).

[12] Ms. Campbell did not complete an RFC assessment, noting that "[n]o RFC/MRFC assessments are associated with this claim." (Tr. 77, 85).

[13] Ms. Campbell also concluded that the plaintiff demonstrated the maximum sustained work capacity for light exertion work." (*See* Tr. 78, 86).

[14] Ms. Campbell did not provide a determination and, instead, indicated that "[t]his claim is not DDS jurisdiction." (Tr. 78–79, 86–87).

Dr. Khurshid Kahn conducted another reconsideration level assessment on August 16, 2016. (*See* Tr. 90–100; Tr. 101–11). In this assessment, Dr. Kahn opined to the same severe impairments and limitations to which Dr. Boyd opined in the April 25, 2016 evaluation of the plaintiff. (*See generally* Tr. 90–100; Tr. 101–11).

B.     ACTIVITIES OF DAILY LIVING

On June 11, 2016, the plaintiff completed a form titled "Function Report – Adult[,]" which asked the plaintiff numerous questions about how her "illnesses, injuries, or conditions limit[ed] [her] activities." (Tr. 267–274). On the form, she indicated that she lived in an apartment with her family, and that "back pain due to work and having seizure[s]" limited her ability to work. (Tr. 267). In response to a question that asked the plaintiff what she does from when she wakes up until she goes to bed, the plaintiff responded: "get my grandchildren rea[d]y for their day. I try to wash clothes[,] try to do house work. When I try the pain in my back starts to hurt[]." (Tr. 268). The plaintiff indicated also that she makes breakfast, lunch, and dinner for her grandchildren, and that her son and daughter help her care for her grandchildren. (Tr. 268). Moreover, in response to a question that asked the plaintiff what she was able to do prior to her conditions that she cannot do now, the plaintiff responded: "bend, clean[] my house[,] walk long walks." (Tr. 268). The plaintiff explained further that she "can't sleep [because] the pain makes [her] toss and turn[] all night." (Tr. 268). The plaintiff noted that, although her daughter helped her get dressed at times, she had "no problem" with personal care activities and did not need reminders to perform these activities or take medications.[15] (Tr. 268).

The plaintiff indicated that she prepared her own meals "sometime[s] daily[,]" and that it took her about one hour to prepare the food. (Tr. 269). She explained also that she was sometimes

---

[15] The "personal care" activities listed were dressing, bathing, caring for hair, shaving, feeding oneself, and using the toilet. (Tr. 268).

unable to prepare her meals because of her "seizures and [her] back pain." (Tr. 269). The plaintiff indicated that she did some cleaning, but that it was "hard [because she] h[ad] to do a lot of bending[,]" and that she could not clean too often because of the pain in her back. (Tr. 269). She noted that she needed some encouragement to do housework, explaining that her son "tr[ies] to get [her] to fold the clothes." (Tr. 269). The plaintiff explained that she did not go outside often, as she could not "be in the sun because of her medication." (Tr. 270). She noted that, when she did travel, she either took public transportation or rode in a car; however, she could not drive because of her seizures, but was able to go out alone. (Tr. 270). The plaintiff explained that she went food shopping once per month and that it usually took one hour to complete because she could not "walk or stand to[o] long." (Tr. 270). The plaintiff provided that she was able to pay bills, count change, handle a savings account, and use checkbooks and money orders; she noted specifically that her conditions had not impacted her ability to handle money. (Tr. 270–71).

The plaintiff explained that she did not have any hobbies, and that she spent time with others by talking to them on the phone or having them visit her house. (Tr. 271). The plaintiff added that she did not need reminders to go places, but that she did need someone to accompany her. (Tr. 271). She indicated that she did not have any problems getting along with family, friends, or neighbors. (Tr. 272). In response to a question asking the plaintiff to "[d]escribe any changes in social activities since the illnesses, injuries, or conditions began[,]" the plaintiff responded, "[C]an't clean the way I want or go places with people[;] scared I might have a seizure." (Tr. 272). The plaintiff noted that her conditions affected the following activities: lifting; bending; standing;

reaching; walking; sitting; kneeling; stair climbing; and memory.[16]  (Tr. 272).  She explained that the "pain in [her] back and [her] seizure[s] stop[] [her] from doing" these activities.  (Tr. 272).

In response to a question that asked the plaintiff how far she could walk before needing to stop and rest, she answered "not over a mile" (Tr. 272); she added that she had to rest for thirty minutes before she could resume walking (Tr. 272).  The plaintiff indicated that she could pay attention of a "long time"; however, she did not always finish what she started, did not follow written instructions well, and only followed oral instructions "somewhat" well.  (Tr. 272).  The plaintiff noted that she got along well with authority figures and that she was never fired because of a problem getting along with other people.  (Tr. 273).  She noted also that she did not handle stress well but that she handled changes in routine "somewhat" well.  (Tr. 273).  The plaintiff indicated that she had no unusual behaviors or fears.  (Tr. 273).  The plaintiff stated that she was taking Carbamazepine, which is a seizure medication, and attending physical therapy.  (Tr. 274).

C.      THE PLAINTIFF'S HEARING TESTIMONY

The plaintiff testified that she was forty-seven years old, unmarried, and had three children and three grandchildren.  (Tr. 30–31).  She explained that she lived with her son and her three grandchildren, and that she received State assistance for one of her grandchildren.  (Tr. 31).  The plaintiff never had a driver's license but had a Connecticut state identification.  (Tr. 31).  She graduated from high school and worked as a self-employed house cleaner, a home health aide, and as a cashier at a Stop and Shop.[17]  (Tr. 32–34).

---

[16] The plaintiff did not answer a question on the form that asked whether she used any of the following assistive devices: crutches; walker; wheelchair; cane; brace/splint; artificial limb; hearing aid; glasses/contact lenses; and artificial voice box.  (Tr. 273).

[17] The plaintiff worked a second job during the time she worked as a cashier at Stop and Shop; however, she could not remember the details of the second job.  (*See* Tr. 34).

The plaintiff testified that her seizures, PTSD and back pain have prevented her from working, and that the worst condition was her seizures. (Tr. 34). She explained that she could "get three [seizures] a month" and that, although she took Tegretol and Depakote to control the condition, the seizures still occurred. (Tr. 34–35). When the ALJ asked about the causes of her seizures, the plaintiff testified that it "could be my high blood pressure, stress. I can't really be out in the sun, you know, too much." (Tr. 36). She testified that, when her seizures occurred, she stayed home instead of going to the hospital "because [her] son knows how to take care of the seizures when [she] has them." (Tr. 35). She added that the seizures lasted for "maybe ten, [fifteen] minutes[,]" and that she could "be sore throughout her body" after a seizure was over. (Tr. 35). The plaintiff testified that she had not spent any nights in the hospital in the year prior to the hearing, but that she spent at least one night in the hospital two years before the hearing due to her seizures.[18] (Tr. 36).

Regarding her PTSD, the plaintiff testified that it was related to depression and came about gradually because she had "traumatic things happen[] to her throughout [her] life." (Tr. 36). She explained that "it started in 1988 when [her] father passed away suddenly, and then another one happened in 2013, and then ever since 2013 [her] depression seem[ed] to be getting worse." (Tr. 36). The plaintiff testified that she saw a therapist, Hope Taylor, once per week and was taking medication (Tr. 43); however, the medication had not improved her condition "because it seem[ed] to [the plaintiff] that [her] condition [was] getting worse because [she did not] get out of bed; [she did not] get dressed. If it was[ not] for [her] son kind of helping her out, [she would not] know where . . . [she] would be at." (Tr. 36–37; *see also* Tr. 43). The plaintiff stated that she had some

---

[18] At the end of the hearing, the plaintiff's counsel mentioned that the plaintiff was waiting to receive a record from St. Vincent's Medical Center regarding a hospitalization for a seizure. (*See* Tr. 49–50). The plaintiff's counsel explained that the plaintiff "was unsure of the exact date, but she thinks about a year ago she was hospitalized for a seizure." (Tr. 49).

problems with anxiety, as she would "get[] kind of really anxious when things don't turn out the way [she] want[s] [them] to." (Tr. 44). She stated also that she had trouble being around people, as she got "to the point [of being] very anxious, and [she] just . . . want[ed] to . . . leave, and sometimes [she could not] because there's a lot of people around." (Tr. 44).

The plaintiff then testified about her back pain. She indicated that she weighed 255 pounds and that her back pain began in 2013. (Tr. 37). She testified that the pain gradually came about, but that "it's just now getting really worse." (Tr. 37). She testified also that the pain occurred "like every other day" and that, at the hearing, she was experiencing pain and "was scared to get up because [she] want[ed] to stand up because it's hurting so bad." (Tr. 37). The plaintiff explained that when she experienced pain, she took "a nice, hot bath" and that she took prescribed Ibuprofen 800mg. (Tr. 38). She testified that, in the couple of weeks prior to the hearing, the heaviest thing she lifted was a half-gallon of milk. (Tr. 38). The plaintiff testified also that she could walk about one block before she had to stop and rest, and that she did not use an assistive device; however, "[i]f there [was] like a rail, or something, [she would] hold onto the rails." (Tr. 38). She added that she could stand for thirty minutes at a time and sit for approximately "15, 20 minutes." (Tr. 38–39).

The plaintiff testified that she could dress and bathe herself. (Tr. 39). The plaintiff's son or the plaintiff's friend assisted her in caring for her three grandchildren. (Tr. 39). The plaintiff testified that she could do dishes; however, she could not do laundry, vacuum, or do yardwork. (Tr. 39). She explained that she and her son went grocery shopping together and that either her son would drive her, or she would take the bus to get around. (Tr. 40). The plaintiff stated that she did not do any social activities and did not attend her grandchildren's school activities but would take her granddaughter to doctor's appointments. (Tr. 40). She added that she did not go

out anywhere with her boyfriend and that, to pass the time during the day, she did a puzzle book, went online, and watched television. (Tr. 40–41).

The plaintiff then testified about her migraines. She stated that her migraines occurred "like once a week" and that "it's like a train wreck." (Tr. 42). She explained that stress and going out in the heat caused her migraines, and that the migraines could "last all night, all day. It depends when it comes." (Tr. 42). The plaintiff explained that she believed her migraines caused problems with her memory, as she sometimes would forget what she was supposed to do on a particular day. (Tr. 43).

D.    VOCATIONAL EXPERT'S TESTIMONY

The vocational expert, Edmond J. Calandra, testified that the plaintiff's previous job as a home health aide was a medium exertion job, "semi-skilled, SVP 4." (Tr. 46). He testified that her job as a cashier at Stop and Shop was "light[] and unskilled." (Tr. 46). The ALJ then asked Mr. Calandra to

> assume an individual . . . [with] the claimant's age, education, [and] past relevant work experience, who is limited to the sedentary exertional level as defined in the regulations, and is unable to complete tasks from beginning to end on a consistent basis, and, thus, [is] unable to stay on task for more than 80 percent of the time in the workplace due to physical and mental limitations.

(Tr. 46–47). He asked Mr. Calandra whether this hypothetical individual would be capable of performing her past relevant work, which Mr. Calandra answered in the negative. (Tr. 47). The ALJ then asked Mr. Calandra if there existed other jobs available in the national economy that this person could perform, which Mr. Calandra likewise answered in the negative. (Tr. 47).

The ALJ then posed a second hypothetical to Mr. Calandra, asking him to

> assume an individual of the claimant's age, education, and past relevant work experience who is limited to the light exertional level as defined in the regulations, and has the further limitations of a need for occasional twisting and squatting, bending and balancing, crawling, kneeling, and climbing, but no climbing of

scaffolds, ropes, [or] ladders. Secondly, the person needs to avoid hazards such as dangerous machinery, unprotected heights, vibration, including driving. And, thirdly, [the person] requires occasional interaction with the public, coworkers, and supervisors, as well as simple, routine, repetitious work.

(Tr. 47). Mr. Calandra testified that this individual would not be able to perform the plaintiff's past relevant work; however, that there did exist jobs available in significant numbers in the national economy that this person could perform. (Tr. 48). Specifically, Mr. Calandra concluded that this hypothetical individual could perform the jobs of maid, assembler, and packer sorter. (Tr. 48). Mr. Calandra added that his testimony was "consistent with the *Dictionary of Occupational Titles* as per Social Security Ruling 00-4p." (Tr. 48).

Under questioning from the plaintiff's counsel, Mr. Calandra testified that, if the second hypothetical individual "were expected to be absent from work more than twice a month on a consistent basis," that would "eliminate full-time, competitive employment." (Tr. 48). He testified also that the limitation to "simple, routine, repetitive tasks would preclude the ability to carry out detailed written and oral instructions[.]" (Tr. 49).

III.    THE ALJ'S DECISION

Following the five-step evaluation process,[19] the ALJ found that the plaintiff's date last insured was March 31, 2020 (Tr. 13), and that the plaintiff had not engaged in substantial gainful

---

[19] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her

activity since the amended alleged onset date of February 2, 2016. (Tr. 13, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*). The ALJ concluded that the plaintiff had the following severe impairments: seizures, degenerative disc disease of the lumbar spine, obesity, and depression.[20] (Tr. 13, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). At step three, the ALJ concluded that the plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). The ALJ found that the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), and that she could engage in occasional bending, balancing, twisting, squatting, kneeling, crawling and climbing but no climbing of ropes, scaffolds, or ladders; she had to avoid hazards such as heights, vibration, and dangerous machinery including driving; she was limited to simple, routine, and repetitive work tasks; and she could have occasional interaction with supervisors, coworkers, and the public. (Tr. 15). At step four, the ALJ concluded that the plaintiff was unable to perform any past relevant work. (Tr. 18, citing 20 C.F.R. §§ 404.1565 and 416.965). At step five, after considering the plaintiff's age, education, work experience, and RFC, the ALJ concluded that additional jobs existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 19, citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)). Specifically, the ALJ found that the plaintiff could perform the jobs of a maid, an assembler, and

---

former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[20] The ALJ noted that medical records from St. Vincent's "indicate that the claimant was treated for various complaints in 2015 including uterine fibroids, GERD, and appendicitis but there [was] no evidence of any treatment related to the claimant's allegations of total disability." (Tr. 13). He added that the records "also indicate[d] that the claimant suffer[ed] from poorly controlled hypertension but there [was] no indication that this condition would affect the claimant's ability to work in a meaningful way." (Tr. 13). The ALJ concluded that these additional impairments were "non-severe." (Tr. 13).

a package sorter. (Tr. 19). Accordingly, the ALJ concluded that the plaintiff was not under a disability, as defined in the Social Security Act, at any time from the amended alleged onset date of February 2, 2016, through the date of his decision. (Tr. 20, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. *See Balsamo*, 142 F.3d at 79 (citation omitted). Second, the court must decide whether substantial evidence supports the determination. *See id.* The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing

court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.     DISCUSSION

The plaintiff claims that the ALJ erred in two general respects.  First, the plaintiff argues that the ALJ erred in assigning no weight to the medical source statements of APRN Marlene St. Juste and Hope Taylor, and in failing to provide a weight assignment to the opinion of consultative examiner, Dr. Sam Ranganathan.  (Pl.'s Mem. at 6).  Second, the plaintiff argues that the ALJ erred in formulating the plaintiff's RFC.  (Pl.'s Mem. at 12).  In opposition, the defendant maintains that "the ALJ arrived at an RFC finding consistent with the record as a whole and, in doing so, provided good reasons in support of his decision to discount the opinions of Ms. St. Juste and Ms. Taylor."  (Def.'s Mem. at 13).  The Court agrees with the defendant.

A.     THE ALJ PROPERLY WEIGHED THE MEDICAL OPINIONS

The plaintiff claims that the ALJ erred in assigning no weight to the medical source statements from APRN St. Juste and clinician Ms. Taylor.  (Pl.'s Mem. at 6–11).  The plaintiff claims also that the ALJ erred in not mentioning or assigning weight to the opinion of the consultative examiner, Dr. Ranganathan.  (Pl.'s Mem. at 11–12).  The defendant responds that (1) the ALJ appropriately afforded no weight to the opinions of APRN St. Juste and Ms. Taylor because they are not acceptable medical sources; (2) Dr. Ragnganathan did not produce a medical opinion as he did not assess the plaintiff's functional abilities and the ALJ nevertheless provided a detailed discussion of his findings; and (3) the ALJ "provided good reasons with the support of substantial evidence when discounting their opinions."  (Def.'s Mem. at 8-9).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

"An APRN is not an acceptable medical source, Social Security Regulation ["SSR"] 06-03p, 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006), but rather, is considered an 'other source[,]' as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d)." *Baldwin v. Colvin*, No. 3:15-CV-1462 (JGM), 2016 WL 7018520, at *10 (D. Conn. Dec. 1, 2016). "An 'other source' may be used to show the severity of the individual's impairments and how the individual's ability to function is affected." *Id.* (citing 20 C.F.R. §§ 404.1513(d) and 416.913(d)). "Under the Regulations, such opinions 'are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.'" *Id.* (quoting SSR 06-03p, 2006 WL 232939, at *3).

Here, the ALJ concluded that APRN St. Juste's opinion was entitled to no weight because "there is no indication what Ms. St. Juste's credentials are or in what capacity she treated the plaintiff." (Tr. 18). The ALJ continued, "[f]urther, the evidence of record does not support the limitations provided because there is very little evidence of any significant treatment for back pain." (Tr. 18).

A review of the records from Optimus reveals that Ms. St. Juste is an APRN who treated the plaintiff on multiple occasions. (*See* Tr. 916–24). The lack of credentials, however, was not the sole reason that the ALJ afforded no weight to APRN St. Juste's opinion. Instead, the ALJ found that "the evidence of record does not support the limitations provided because there is very little evidence of any significant treatment for back pain." (Tr. 18). It is this additional reason that causes the plaintiff's claim to fail.

A review of the records from Optimus reveals that, although the plaintiff complained of a "backache[,]" examinations of her back revealed, at most, "tenderness on palpation." (*See* Tr. 641, 922). She treated her back pain with relatively conservative measures. For example, she was prescribed Ibuprofen 400mg and physical therapy for her back pain and was advised to take a warm bath when experiencing discomfort.[21] (*See, e.g.*, Tr. 627, 635, 642, 920). Also, the plaintiff claimed that her back pain started in 2013; however, Optimus treatment notes from 2013 to 2015 indicate that the plaintiff had no musculoskeletal symptoms. (*See* Tr. 648, 653–55, 663). And a May 2017 record from St. Vincent's Emergency Department indicated that the plaintiff had "[n]o back pain." (Tr. 971). In addition, after reviewing x-rays of the plaintiff's lower back during the consultative examination, Dr. Ranganathan concluded that the plaintiff had "[m]ild multilevel

---

[21] An MRI of the plaintiff's lower back was ordered; however, it is not clear that the patient obtained the MRI. (*See* Tr. 630–31 ("MRI ordered"); Tr. 918 ("MRI denied")).

degenerative joint disease[,]" which the ALJ considered in his decision. (Tr. 583; *see* Tr. 17-18).[22]

Examinations at Bridgeport Hospital mostly revealed normal range of motion and "no edema, tenderness or deformity." (*See* Tr. 805, 812). Although the plaintiff complained of back pain, the ALJ was correct in noting that there was "little evidence of any significant treatment for back pain" (Tr. 18), and, therefore, that the evidence in the record did not support the limitations to which APRN St. Juste opined. Accordingly, the ALJ did not err in affording no weight to the opinion of APRN St. Juste, and, contrary to the plaintiff's contention, did consider Dr. Ranganathan's consultative examination.

Similarly, the ALJ did not err in affording no weight to the opinion of Ms. Taylor. The ALJ reasoned that he afforded Ms. Taylor's opinion no weight because

> [t]he form is not signed by a medical doctor and Ms. Taylor is not an acceptable medical source. Further, the only mental health treatment records are from Life Bridge and these records indicate sporadic treatment with no evidence that the claimant was ever considered for a higher level of care. Further, it appears that Ms. Taylor completed the form more in the manner of a concerned advocate rather [than] in the manner of an objective treating source.

(Tr. 18).

According to the LifeBridge records, Ms. Taylor began treating the plaintiff in June 2017. Her notes reflect that the plaintiff often presented with "dysregulation of mood and emotions" (Tr. 852, 854), which caused the plaintiff to twice have an inability to get out of bed. (Tr. 852). Ms. Taylor's treatment notes never indicate that the plaintiff experienced trouble interacting with the general public, following instructions, or sustaining a routine without special supervision. Moreover, the other LifeBridge records reveal that the plaintiff was alert and cooperative, had

---

[22] Dr. Ranganathan did not offer a medical opinion. Medical opinions "are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

good judgment, appropriate mood and thought content, and normal concentration. (*See* Tr. 833–34, 840–41, 849). The evidence in the record does not support Ms. Taylor's opinion that the plaintiff had "poor" or "no[] ability to do the majority of activities listed on the medical source statement. Accordingly, the ALJ did not err in affording no weight to the opinion of Ms. Taylor.

B.     <u>SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S RFC DETERMINATION</u>

The plaintiff argues that the ALJ's RFC determination leaves out "significant deficits from Ms. Miller's RFC, which have been noted in the medical records, and which Ms. Miller described in her testimony." (Pl.'s Mem. at 14). The defendant responds that "[s]ubstantial evidence, from both before and after [the] [p]laintiff's amended onset date, supports the ALJ's RFC for light work with postural, environmental, and mental limitations." (Def.'s Mem. at 5).

The plaintiff's RFC is "the most she can still do despite her limitations" and is determined "based on all the relevant evidence in [the] case record[,]" namely, "all of the relevant medical and other evidence." 20 C.F.R. § 404.1527(a)(1), (3); *see also Gonzales v. Berryhill*, No. 3:17-CV-1385 (SALM), 2018 WL 3956495, at \*14 (D. Conn. Aug. 17, 2018). "[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at \*1 (S.S.A. July 2, 1996)). Before classifying a claimant's RFC based on exertional level, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945." *Id.* (internal quotation marks omitted). The functions described in these paragraphs

> include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding

> appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors.

*Id.* However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]" *Id.* at 178 n. 3 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (citing 42 U.S.C. § 405(g)) (summary order); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls." *Id.*

Here, the ALJ concluded that the plaintiff had the RFC

> to perform light work as defined in 20 C.F.R. [§§] 404.1567(b) and 416.967(b). The claimant can engage in occasional bending, balancing, twisting, squatting, kneeling, crawling, and climbing but no climbing of ropes, scaffolds and ladders. The claimant must avoid hazards such as heights, vibration and dangerous machinery including driving. The claimant is limited to simple, routine repetitious tasks. The claimant can have occasional interaction with supervisors, coworkers and the public.

(Tr. 15).

The plaintiff maintains that the ALJ's RFC determination should have included a requirement that a job permit her to change position "at will from sitting, standing, and walking." (*See* Pl.'s Mem. at 13). The plaintiff bases this argument on APRN St. Juste's medical source statement, in which she noted that the plaintiff "need[ed] a job which permit[ted] shifting positions *at will* from sitting, standing or walking[.]" (Tr. 999).

An RFC determination will be upheld when supported by substantial evidence in the record. 20 C.F.R.§§ 404.1529(c)(3), 416.929(c)(3). The Court has concluded already that the ALJ properly afforded APRN St. Juste's opinion no weight, as the evidence in the record does not support the limitations to which APRN St. Juste opined. *See* Part V.A. *supra.* Moreover, a December 21, 2016 physical examination revealed that the plaintiff had "normal range of motion" throughout her musculoskeletal system and exhibited "no edema, tenderness, or deformity." (Tr. 950). A May 10, 2017 a physical examination of the plaintiff revealed that her motor strength was "5/5 bilaterally" and that she had "normal gait with good posture and balance." (Tr. 942). Also, the plaintiff testified that she experienced back pain "like every other day" that lasted for "[f]or a couple of hours." (Tr. 37–38). She testified that, when she experienced pain, she took "a nice, hot bath" and Ibuprofen. (Tr. 38). The plaintiff was also able to go grocery shopping (Tr. 40), sit at the computer to go online, and watch television. (Tr. 41). She cared for her grandchildren and took her granddaughter to the doctor. (Tr. 39–40). The ALJ did not err in basing his RFC assessment on evidence supported in the record.

The plaintiff argues also that the ALJ's RFC determination improperly failed to account for the plaintiff's absenteeism and off-task behavior. (*See* Pl.'s Mem. at 13–14). The plaintiff bases this argument on the medical source statements of APRN St. Juste and Ms. Taylor. (*See* Pl.'s Mem. at 13). APRN St. Juste opined that the plaintiff would have to take an unscheduled break every thirty minutes, which would last fifteen minutes, and that she would be absent from work more that twice per month. Ms. Taylor also opined that the plaintiff would be absent from work two or more times each month, and that the plaintiff had "poor" or "no[] ability in several areas of functioning. (*See* Tr. 994–96).

The Court had concluded previously that the ALJ did not err by assigning no weight to the opinions of APRN St. Juste and Ms. Taylor.  *See* Part V.A. *supra.*  Moreover, the evidence in the record reflects that, for the most part, the plaintiff's ability to concentrate was normal.  (*See* Tr. 833–34, 840–41, 849, 965).  Although there were times when the plaintiff was unable to get out of bed, she was working on developing routines that focused on giving her responsibilities and a "feeling of purpose."  (Tr. 854).

The ALJ's RFC determination limited the plaintiff to light work and included numerous postural limitations to account for the plaintiff's alleged back pain and several environmental limitations to account for her seizures.  (*See* Tr. 15).  To account for her issues with depression, the ALJ also limited the plaintiff to simple, routine, repetitive work and only occasional interaction with others.  (*See* Tr. 15).  The ALJ properly rejected the opinions of APRN St. Juste and Ms. Taylor, which is the only evidence supporting the plaintiff's claims that she must change position "at will[,]"  have excessive absenteeism, or engage in off-task behavior. An ALJ does not err in his RFC determination when he fails to include limitations that are not supported by the record.  The ALJ appropriately weighed "'*all* of the evidence available to make an RFC finding that [was] consistent with the record as a whole.'" *Jackson v. Berryhill*, 1:17-CV-351-RJA, 2019 WL 2723415, at *3 (W.D.N.Y. July 1, 2019) (quoting *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 587 (W.D.N.Y. 2018) (citing *Matta v. Astue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) (emphasis added)).  Accordingly, the ALJ did not err by omitting these limitations from his RFC; substantial evidence supports the ALJ's RFC determination.

VI.   CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is DENIED, and the defendant's Motion to Affirm (Doc. No. 14) is GRANTED.

This is not a recommended ruling.  The consent of the parties allows this Magistrate Judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment.  *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated at New Haven, Connecticut this 11th day of March 2020.

/s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge